**Electronically Filed
Intermediate Court of Appeals
CAAP-15-0000948
27-NOV-2019
09:46 AM**

NO. CAAP-15-0000948

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI


PHANNATHON OYAMOT, Plaintiff-Appellant,
v.
KAWAILOA DEVELOPMENT, LLP DOING BUSINESS AS
GRAND HYATT KAUAI RESORT & SPA AND POIPU BAY
GOLF COURSE, A DOMESTIC LIMITED LIABILITY
PARTNERSHIP AND JONATHAN BURGER,
Defendants-Appellees,
and
STEPHANIE SKOW, M.D.,
Real Party In Interest-Appellee,
and
JOHN DOES 1-10 AND JANE DOES 1-10,
Defendants


APPEAL FROM CIRCUIT COURT OF THE FIFTH CIRCUIT
(CIVIL NO. 11-1-0070 KNW)


MEMORANDUM OPINION
(By: Ginoza, Chief Judge, Fujise and Hiraoka, JJ.)

Plaintiff-Appellant Phannathon Oyamot (**Oyamot**) appeals
from a "Final Judgment" entered on November 23, 2015 by the
Circuit Court of the Fifth Circuit (**Circuit Court**).[1] Oyamot also
challenges "all orders referenced in said judgment,"[2] an "Order

---

[1] The Honorable Kathleen N. Watanabe (**Judge Watanabe**) presided.

[2] Although "[a]n appeal from a final judgment brings up for review all
interlocutory orders not appealable directly as of right which deal with
(continued...)

Granting Movant Stephanie Skow, M.D.'s Motion to Quash Subpoena, or in the Alternative, Motion for Protective Order and for Award of Fees and Costs" (**Order Granting Dr. Skow's Motion to Quash**) entered on October 5, 2015, and an "Order Denying Plaintiff Phannathon Oyamot's Amended Motion to Re-consider Stephenie [sic] Skow's Motion to Quash Subpoena, or in the Alternative, Motion for Protective Order Filed Sept. 1, 2015. Or to Stay Sanctions Pending Appeal" (**Order Denying Reconsideration of Dr. Skow's Motion to Quash**) entered on January 22, 2016, all by the Circuit Court.

On appeal, Oyamot contends that (1) "the court erred by not recusing itself due to apparent and actual bias, and conducted itself so as to deprive Ms. Oyamot of a fair trial[,]" (2) "the court erred and confirmed its bias by refusing to allow Plaintiff's case to be determined by the jury when the court granted Defendants'[3] [Hawai'i Rules of Civil Procedure (**HRCP**)] rule 50[4] motion[s] for judgment as a matter of law despite

---

(...continued)
issues in the case[,]" <u>Ueoka v. Szymanski</u>, 107 Hawai'i 386, 396, 114 P.3d 892, 902 (2005) (citation and internal quotation marks omitted), we also note that points not argued in an appellant's Opening Brief may be deemed waived. Hawai'i Rules of Appellate Procedure (**HRAP**) Rule 28(b)(7). Therefore, we will only review the Circuit Court orders for which Oyamot provides argument in her briefs.

[3] "Defendants" refers to Defendant-Appellee Kawailoa Development, LLP, dba Grand Hyatt Kauai Resort & Spa and Poipu Bay Golf Course, a Domestic Limited Liability Partnership (**Kawailoa**), Defendant Hyatt Corporation (**Hyatt**), and Defendant-Appellee Jonathan Burger (**Burger**).

[4] HRCP Rule 50 provides, in relevant part:

> **Rule 50.** **Judgment as a matter of law in jury trials; alternative motion for new trial; conditional rulings.**
>
> (a) *Judgment as a matter of law.*
> (1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated

(continued...)

2

clear admission by [Kawailoa and Hyatt's] witnesses of failure to investigate sexual harassment and disparate treatment of Plaintiff[,]" (3) "the court erred by hampering Plaintiff's ability for a fair trial by striking all of Plaintiff's crucial expert witnesses[,]" (4) "the court erred by striking Plaintiff's lay witnesses as sanctions against Plaintiff[,]" and (5) "the trial court committed numerous errors in rulings as to motions in limine with intent to eviscerate Plaintiff's case[.]"

For the reasons discussed below, we affirm in part, vacate in part, and remand for further proceedings.

**I.    Background**

**A.    Facts**

This case arises from Oyamot's employment at the Grand Hyatt Kauai Resort & Spa (**the Hotel**) where she worked as a cocktail server from March 2005 to December 2010, and also for one day in January 2011.[5] Oyamot is a Thai national and, at the time of the incidents described herein, a resident of the County of Kauai.

From approximately August 31, 2008, through approximately July 18, 2010, Burger was the Beverage Manager at the Hotel and Oyamot's supervisor. In her "Second Amended Complaint," Oyamot alleges that during this time Burger made "disparaging statements about [Oyamot's] Thai ancestry" and "subjected [Oyamot] to inappropriate conduct of a sexual nature and disparate treatment of discipline[.]"

---

(...continued)
                    without a favorable finding on that issue.
                        (2) Motions for judgment as a matter of law may
              be made at any time before submission of the case to
              the jury. Such a motion shall specify the judgment
              sought and the law and the facts on which the moving
              party is entitled to the judgment.

[5]  Kawailoa owns the Hotel and employs all Hotel employees with the exception of the general manager and the managing committee, who are employed by Hyatt. Neither Burger nor Oyamot were either the general manager or on the managing committee.

As a result of these alleged actions, Oyamot sought psychiatric care from, *inter alia*, psychiatrist Stephanie Skow, M.D. (**Dr. Skow**) who is also an Appellee in the instant case.

### B. Procedural History

On June 27, 2011, Oyamot filed her Second Amended Complaint against Kawailoa, Hyatt, and Burger. In her Second Amended Complaint, Oyamot alleges that during her employment, she was subjected to (1) national origin discrimination in violation of Hawaii Revised Statutes (**HRS**) § 378-2(1)(A) (Supp. 2008)[6] (**Count I**) (2) sexual harassment in violation of the same statute (**Count II**), and (3) intentional infliction of emotional distress (**IIED**) (**Count III**).

On August 26, 2013, Oyamot filed her "Witness List" identifying, *inter alia*, Dr. Skow as an Expert Witness psychiatrist to testify regarding "[d]iagnosis, treatment prognosis, pain and suffering, distress, medical costs[.]"

On January 3, 2014, Kawailoa, Hyatt, and Burger filed a joint "Motion for Partial Summary Judgment as to [Oyamot's] Claims for Disparate Treatment Discrimination, Intentional Infliction of Emotional Distress, and Punitive Damages (Counts I, II, and III)" and a joint "Motion for Partial Summary Judgment on [Oyamot's] Claims for Sexual or National Origin Harassment,

---

[6] At the time the offenses described in Oyamot's Second Amended Complaint occurred, HRS § 378-2(1)(A) provided:

> **§378-2 Discriminatory practices made unlawful; offenses defined.** It shall be unlawful discriminatory practice:
> (1) Because of race, sex, sexual orientation, age, religion, color, ancestry, disability, marital status, or arrest and court record:
> (A) For any employer to refuse to hire or employ or to bar or discharge from employment, or otherwise to discriminate against any individual in compensation or in the terms, conditions, or privileges of employment[.]

In 2011, the section was amended by, *inter alia*, adding a section "(a)" at the beginning of the section to read: "§378-2 Discriminatory practices made unlawful; offenses defined. (a) It shall be unlawful discriminatory practice[.] . . ." 2011 Haw. Sess. Laws Act 206, §2 at 675.

4

Intentional Infliction of Emotional Distress, and Punitive Damages (Counts I, II, and III)[.]"

On July 23, 2014, the Circuit Court denied both of the joint motions for partial summary judgment.

On August 1, 2014, Burger filed a motion for partial reconsideration of the Circuit Court's orders denying the joint motions for partial summary judgment, based on the Hawaiʻi Supreme Court's recent decision in Lales v. Wholesale Motors Co., 133 Hawaiʻi 332, 344, 328 P.3d 341, 353 (2014) (holding that "[i]ndividual employees are . . . not personally liable as 'employers' for harassment and retaliation claims under HRS §§ 378-2(1)(A) and 378-2(2).") Specifically, Burger requested that the Circuit Court dismiss "all discrimination, including the harassment claims" i.e., Counts I and II, against him.

On September 12, 2014, the Circuit Court entered an order granting Burger's motion for partial reconsideration, thereby dismissing Counts I and II against Burger. Oyamot does not challenge this order on appeal.

On May 8, 2015, Oyamot, Kawailoa, Hyatt, and Burger engaged in an unsuccessful settlement conference, in which Oyamot participated by telephone from Thailand.

On May 20 and 21, 2015, Kawailoa and Hyatt filed several motions in limine. The only motions relevant to the instant appeal are Kawailoa and Hyatt's "Motion in Limine No. 3 to Exclude the Testimony and Records of Dr. Steven Penner" (**Dr. Penner**)[7] (**Kawailoa and Hyatt's MIL 3**) and Kawailoa and Hyatt's "Motion in Limine No. 4 to Exclude the Testimony and Records of Dr. Stephanie Skow" (**Kawailoa and Hyatt's MIL 4**).

On July 1, 2015, the Circuit Court held a hearing on the motions in limine and issued its oral rulings. The Circuit Court orally granted Kawailoa and Hyatt's MIL 3, and granted in part and denied in part Kawailoa and Hyatt's MIL 4.

---

[7] Dr. Penner is a family medicine physician and was Oyamot's doctor.

On July 23, 2015, the parties participated in a second settlement conference (**7/23/15 settlement conference**), which Oyamot attended in person.  This conference was not successful, either.

Also on July 23, 2015, Oyamot filed a subpoena for the appearance of Dr. Skow as a witness at trial, requesting that she appear in court on September 4, 2015.  However, Oyamot did not serve Dr. Skow on July 23, 2015.

On August 5, 2015, the Circuit Court entered its Order granting Kawailoa and Hyatt's MIL 3.

Also on August 5, 2015, the Circuit Court entered its Order granting in part and denying in part Kawailoa and Hyatt's MIL 4.

On August 7, 2015, Oyamot filed her "Motion to Recuse Judge Kathleen Watanabe" (**Motion to Recuse**) attaching, *inter alia*, Declarations of herself and her counsel, Stanford H. Masui (**Masui**).

On August 10, 2015, Oyamot filed her "Motion in Limine re: 'Food Stamp Fraud Investigation' and Records of Dept. of Human Services [(**DHS**)] (Subpoenaed July 21, 2015, and July 22, 2015)" (**Oyamot's MIL 4**).[8]

On August 31, 2015, trial commenced on Counts I-III against Kawailoa and Hyatt and on Count III against Burger.

On September 1, 2015, Oyamot served Dr. Skow with the subpoena.

---

[8]  Oyamot's MIL 4 sought to "bar and prohibit all reference to, argument, and questioning of any witnesses regarding the records of the [DHS] and any benefits applied for, or received by plaintiff from any programs of said department, including, but not limited to the Food Stamp Assistance and/or Supplemental Nutrition Assistance ("SNAP" program)."  In an attached Declaration, Masui states that attached Exhibit A contains true and correct copies of "subpoenaed records taken on July 21, 2015 from [DHS].  Page 47 was shown to plaintiff as proof of plaintiff's commission of 'Food Stamp Fraud' by failure to report workers' compensation and other income."  Masui's Declaration further states that Oyamot voluntarily reported her income to the DHS, and that "allowance of arguments and insinuations that Ms. Oyamot was involved in 'Food Stamp fraud' or similar statements implying irregularity will be extremely prejudicial[.]"

6

Also on September 1, 2015, Dr. Skow filed a "Motion to Quash Subpoena; or in the Alternative, Motion for Protective Order" (**Motion to Quash**).

On September 4, 2015, the Circuit Court held a hearing on and orally granted Dr. Skow's Motion to Quash.

On September 8, 2015, Kawailoa and Hyatt filed a "Renewed Motion in Limine No. 4 To Exclude the Testimony and Records of Dr. Stephanie Skow" (**Kawailoa and Hyatt's Renewed MIL 4**). Burger joined the motion.

On September 11, 2015, the Circuit Court orally granted Kawailoa and Hyatt's Renewed MIL 4.[9]

On September 15, 2015, the Circuit Court entered an order denying Oyamot's Motion to Recuse.

On September 17, 2015 at trial, Kawailoa and Hyatt moved for directed verdict pursuant to HRCP Rule 50 on all Counts. Burger joined. Following arguments by the parties, the Circuit Court orally granted the motions for directed verdict "in favor of all defendants and in favor of all claims."

On October 5, 2015, the Circuit Court entered its Order Granting Dr. Skow's Motion to Quash. The Circuit Court's Order granted the Motion to Quash by releasing Dr. Skow from the subpoena filed on July 23, 2015 and awarded fees and costs in the amount of $4,045.47 to Dr. Skow to be paid by Oyamot.

On October 21, 2015, Oyamot filed an "Amended Motion to Re-consider [Dr. Skow's Motion to Quash] Filed Sept. 1, 2015. Or to Stay Sanctions Pending Appeal."

On October 27, 2015, the Circuit Court entered its written "Order Granting Defendant Jonathan Burger's Motion for Judgment as a Matter of Law Under Rule 50 of the Hawai'i Rules of Civil Procedure" (**Burger JMOL Order**) and written "Order Granting Defendants Kawailoa Development LLP and Hyatt Corporation's Motion for Judgment as a Matter of Law Under Rule 50 of the

---

[9] The record on appeal does not include a written order memorializing the Circuit Court's oral grant of the Hotel Appellees' renewed MIL 4.

Hawai'i Rules of Civil Procedure" (**Kawailoa and Hyatt JMOL Order**) (collectively, **the JMOL Orders**).

On November 23, 2015, the Circuit Court entered its Final Judgment.

On December 22, 2015, Oyamot timely appealed.

On January 22, 2016, the Circuit Court entered its Order Denying Reconsideration of Dr. Skow's Motion to Quash.

## II.   Standard of Review

### A.   Motion to Recuse the Circuit Court

> Decisions on recusal or disqualification present perhaps the ultimate test of judicial discretion and should thus lie undisturbed absent a showing of abuse of that discretion. As one court stated:
>
> > The jurist requested to recuse himself [or herself] is the most capable to determine those factors hidden in the recesses of the mind and soul which would bear upon his or her capability to maintain the impartiality that each matter must receive. The decision of that judge is final, subject to review only for an abuse of that discretion.

State v. Ross, 89 Hawai'i 371, 375-76, 974 P.2d 11, 15-16 (1998) (citation, internal brackets, and ellipsis omitted)).

### B.   Judgment as a Matter of Law

It is well settled that a trial court's rulings on motions for judgment as a matter of law are reviewed *de novo*. Aluminum Shake Roofing, Inc. v. Hirayasu, 110 Hawai'i 248, 251, 131 P.3d 1230, 1233 (2006).

> When we review the granting of a [motion for judgment as a matter of law], we apply the same standard as the trial court.
>
> A [motion for judgment as a matter of law] may be granted only when after disregarding conflicting evidence, giving to the non-moving party's evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in the non-moving party's favor, it can be said that there is no evidence to support a jury verdict in his or her favor.

Id. (quoting Miyamoto v. Lum, 104 Hawai'i 1, 6-7, 84 P.3d 509, 514-515 (2004) (internal citations omitted)).

### C.   Motion to Quash a Subpoena

"On review, the action of a trial court in enforcing or quashing [a] subpoena will be disturbed only if plainly arbitrary

and without support in the record." Bank of Hawaii v. Shaw, 83 Hawai'i 50, 59, 924 P.2d 544, 553 (App. 1996) (internal quotation marks and citations omitted).

### D.    Sanctions

"The imposition of a sanction is generally within the discretion of the trial court." Ek v. Boggs, 102 Hawai'i 289, 299, 75 P.3d 1180, 1190 (2003) (citation omitted). "A court abuses its discretion whenever it exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party." In re Guardianship of Carlsmith, 113 Hawai'i 211, 223, 151 P.3d 692, 704 (2006) (citation, internal quotation marks, and ellipsis omitted).

## III. Discussion

### A.    Motion to Recuse

Oyamot argues that the Circuit Court erred by not recusing itself due to apparent and actual bias, thereby conducting itself so as to deprive Oyamot of a fair trial. Specifically, Oyamot argues that certain statements made by Judge Watanabe at the 7/23/15 settlement conference[10] created the appearance of impropriety or bias, and that subsequent conduct by Judge Watanabe at trial aligned with these statements confirmed and established actual bias. We first address Oyamot's arguments regarding Judge Watanabe's alleged statements at the 7/23/15 settlement conference, followed by an analysis of Oyamot's arguments regarding Judge Watanabe's subsequent conduct.

### 1.    7/23/15 Settlement Conference Statements

Oyamot's Opening Brief cites the following statements allegedly made by Judge Watanabe at the 7/23/15 settlement conference as indices of an "appearance of impropriety and bias":

---

[10] The Points of Error section of Oyamot's Opening Brief states that "the court's false statement that Oyamot's treating psychiatrist Stephenie [sic] Skow would 'take the fifth' and among [sic] other statements made during settlement conference" demonstrated bias. Therefore, we assume the statements referenced in the corresponding Argument section of Oyamot's Opening Brief also occurred during the 7/23/15 settlement conference, particularly in light of the lack of citations to the record or indications otherwise.

9

(1) that Dr. Skow was "being investigated" and would "take the Fifth[,]" (2) that the Circuit Court "would not allow [Oyamot's] treating physicians to testify under any circumstances (even as percipient experts)," and (3) that the Circuit Court "would allow an alleged investigation of Oyamot for 'Food Stamp fraud' come [sic] into evidence even before a motion was filed[.]" The appellate record does not include a transcript of the 7/23/15 settlement conference.

The following excerpt from this court's Memorandum Opinion in <u>Big Island Toyota, Inc. v. Trevino</u>, No. CAAP-12-0000995, 2014 WL 321941 (Hawai'i App. Jan. 29, 2014) serves as Oyamot's sole supporting authority for her contentions regarding the Circuit Court's alleged bias:

> "The test for appearance of impropriety is *whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality* and competence is impaired." <u>Office of Disciplinary Counsel v. Au</u>, 107 Hawai'i 327, 338, 113 P.3d 203, 214 (2005) (citation, internal quotation marks and brackets omitted). Rule 2.11(a)(1) of the [Hawai'i Code of Judicial Conduct (**HCJC**)] contains the same language as 28 U.S.C. § 455(b)(1), providing that a judge shall disqualify himself "[w]here he has a personal bias or prejudice concerning a party, *or personal knowledge of disputed evidentiary facts concerning the proceeding*[.]" 28 U.S.C. § 455(b)(1) (current through P.L. 113-47).

<u>Id.</u> at *5 (emphasis added in Appellant's Brief).[11] HCJC Rule 2.11(a)(1) and its comment provide:

> **Rule 2.11. DISQUALIFICATION OR RECUSAL**
>
> (a) Subject to the rule of necessity, a judge shall disqualify or recuse himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to the following circumstances:
>
> (1) The judge has a personal bias or prejudice for or against a party or a party's lawyer, or personal knowledge of facts that are in dispute in the proceeding.
>
> . . . .

---

[11] Oyamot's Opening Brief misquotes <u>Trevino</u> by adding two case citations to this block quote which do not appear in our Memorandum Opinion. Neither case is relevant to Oyamot's point of error.

*COMMENT:*

*[1] Under Rule 2.11(A), a judge is disqualified or recused whenever the judge's impartiality might reasonably be questioned, regardless of whether any of the specific provisions of Rules 2.11(a)(1) through (6) apply.*

HCJC Rule 2.11(a) and Rule 2.11 cmt. 1 (asterisks omitted).

We interpret the emphasis on "personal knowledge of disputed evidentiary facts concerning the proceeding" in Oyamot's Opening Brief as arguing that Judge Watanabe's "appearance of impropriety and bias" stemmed from her alleged personal knowledge of the proceeding before her.

### i. The Investigation of Dr. Skow and "Pleading the Fifth"

Oyamot's Declaration attached to her Motion to Recuse states:

3. On July 23, 2015, I met with Judge Kathleen Watanabe for a settlement conference with my attorney. During the conference, Judge Watanabe told us, "Dr. Skow is under investigation for possible social security fraud for the report she wrote about your disability. Her lawyer said that she will not testify and will take the 5th."

Masui's Declaration attached to the Motion to Recuse quotes Judge Watanabe as saying "Dr. Skow's attorney has made known that there is an investigation against Dr. Skow for possible social security fraud, and that she will take 'the Fifth', and will not testify."

First, even if personally known to Judge Watanabe, whether or not Dr. Skow is being investigated does not constitute "facts that are in dispute in the proceeding" per HCJC Rule 2.11(a)(1), because such information is irrelevant to the Counts alleged in Oyamot's Second Amended Complaint. *Cf.* Trevino, 2014 WL 321941 at *6-7 (holding that a judge should have recused himself for possessing personal knowledge of facts in dispute in the instant proceeding concerning an employer's tortious claims against an employee, when the judge had, as a practicing attorney, served as counsel for another employee of the same company regarding his "contentious" termination package three years prior).

11

Second, the record demonstrates that Judge Watanabe's statement that Dr. Skow would "take the Fifth" did not stem from personal knowledge. "Knowledge" as defined in the HCJC "mean[s] actual knowledge of the fact in question" and "[a] person's knowledge may be inferred from circumstances." Additionally, Black's Law Dictionary defines "personal knowledge" as "[k]nowledge gained through firsthand observation or experience, as distinguished from a belief based on what someone else has said." Id. at 1004 (emphasis added); see also Hawai'i Rules of Evidence (**HRE**) Rule 602 cmt. (stating that "Personal knowledge," for purposes of this rule, means that the witness perceived the event about which he testifies and that he has a present recollection of that perception). Both Oyamot's and Masui's Declarations attest that Judge Watanabe did not possess "personal knowledge" about Dr. Skow "taking the Fifth" because she learned about it from Dr. Skow's counsel.

Based on the foregoing, we reject Oyamot's contentions.

### ii. Barred Testimony by Treating Physicians

Neither Oyamot's nor Masui's Declaration quote Judge Watanabe as saying that she would "not allow [Oyamot's] treating physicians to testify under any circumstances (even as percipient experts)[.]" Rather, in his Declaration, Masui states that Dr. Penner's testimony was "barred by the court, to the extent that his observations of symptomology, change in personality, and referral of his patient to a mental health provider would have been relevant to the issue of emotional distress. This is the other expert who the judge was referring to during the conference." (Emphasis added). Oyamot's Declaration quotes Judge Watanabe as saying that Dr. Penner "might be able to testify" about topics not proscribed by the Circuit Court's order granting Kawailoa and Hyatt's MIL 3. Such limitations are not equivalent to the Circuit Court "not allow[ing]" Oyamot's treating physicians to testify "under any circumstance[.]"

Based on the foregoing, we reject Oyamot's contentions.

### iii. Food Stamp Fraud Investigation

Oyamot's Opening Brief argues that we should review Judge Watanabe's "stated intention to rule against Oyamot about potential evidence regarding the so-called Food Stamp Fraud investigation . . . before any motions had been filed and briefs [sic] and a complete record presented to the court."  In her Reply Brief to Burger, Oyamot clarifies her argument by stating:

> The trial judge in this case expressed personal knowledge about . . . the admissibility of evidence of Oyamot's fraud investigation prior to any briefing of the issues (and apparently made up her mind as to admissibility when reviewing an unauthenticated alleged <u>Miranda</u> warning document signed by Oyamot).

With regards to the food stamp fraud issue, Oyamot's Declaration states:

> 7.  The judge also provided a document involving my repayment of certain amounts of overpayments made by the [DHS] Food Stamp program.  The judge said that I was investigated for "food stamp fraud" and that this would come in to court.

On this topic, Masui's Declaration quotes Judge Watanabe as saying "You should be aware that the records of the Food Stamp [sic] show investigation for fraud on your part, and this <u>might</u> come in to court."  (Emphasis added).

In light of this conflicting evidence, we cannot say that Judge Watanabe's alleged statements created any appearance of impropriety and bias.  Furthermore, the Supreme Court of Hawai'i has stated in <u>Assocs. Fin. Servs. Co. of Hawai'i, Inc. v. Mijo</u>, 87 Hawai'i 19, 950 P.2d 1219 (1998) that "[a] judge who is conducting a settlement conference acts within the bounds of propriety when he [or she] offers his [or her] assessment of a case as he [or she] understands it and recommends a settlement."  <u>Id.</u> at 28, 950 P.2d at 1228 (citation omitted).  As argued by Oyamot, Judge Watanabe had yet to review any motions on the food stamp fraud documentation.  By the same token, Oyamot cannot argue that Judge Watanabe had definitively ruled on their admissibility.  Rather, without argument or evidence to the contrary, it appears that Judge Watanabe was offering her

13

assessment of the case as she understood it at the time of the settlement conference.

Based on the foregoing, we reject Oyamot's contentions.

**2.    Judge Watanabe's Alleged "Actual Bias"**

Oyamot argues, without explanation, that barring her treating physicians from testifying even as "percipient experts" and granting in part Oyamot's MIL 4 only to the extent of barring the words "food stamp fraud" established actual bias by the Circuit Court.

Oyamot also argues, again, without explanation, that Judge Watanabe exhibited "bias and abuse of discretion" through:

> multiple rulings and sanctions against Ms. Oyamot and
> counsel sustaining multiple and bizarre defense objections
> to "courtroom etiquette and protocol" (see Clerk's Minutes .
> . . : (". . . Court instructed Mr. Masui to refrain from
> shaking his head," "rolling his eyes," "making faces";
> Sept. 3, 2016, "stern warning(s)" ROA 11, pdf 422)) as well
> as multiple evidentiary rulings excluding clearly relevant
> and non-hearsay evidence of sexual and national origin
> harassment.

Finally, Oyamot argues, again, without supporting evidence or authority, that "quashing the subpoena for the reluctant treating psychiatrist [Dr. Skow] reveals that the statement made by the court in settlement conference was clearly a veiled threat to bar Skow's testimony, and not merely an 'objective assessment' of the case."

Absent a discernable argument, citations to authority in support of her position, and citations to the record to support her factual assertions, Oyamot fails to support her contentions.  See HRAP Rule 28(b)(7); Kakinami v. Kakinami, 127 Hawai'i 126, 144 n.16, 276 P.3d 695, 713 n.16 (2012) (citing In re Guardianship of Carlsmith, 113 Hawai'i at 246, 151 P.3d at 727 (noting that this court may "disregard a particular contention if the appellant makes no discernible argument in support of that position") (internal quotation marks and brackets omitted))).

Based on the foregoing, Oyamot's first point of error lacks merit.

14

B.    **Judgment as a Matter of Law**

In her second point of error, Oyamot argues that:

[t]he court erred and confirmed its bias by refusing to allow Plaintiff's case to be determined by the jury when the court granted [Kawailoa, Hyatt, and Burger's HRCP] rule 50 motion[s] for judgment as a matter of law despite clear admission by [Kawailoa and Hyatt's] witnesses of failure to investigate sexual harassment and disparate treatment of Plaintiff[.]

We will address the Circuit Court's JMOL Orders as to each defendant in turn.

1.    **Hyatt**

The Circuit Court granted judgment as a matter of law to Hyatt on Counts I (national origin discrimination) and II (sexual harassment) based on Oyamot's failure to show that Hyatt was her employer and as to Count III (IIED) based on Oyamot's failure to show that Burger's conduct toward her was "outrageous."[12]  We affirm, but based upon a different analysis with regards to Count III.

i.    **Counts I and II (National Origin Discrimination and Sexual Harassment)**

HRS § 378-2(1)(A) prohibits an <u>employer</u> from discriminating against an employee based on, *inter alia*, sex or ancestry.

---

[12]    The elements of the tort of intentional infliction of emotional distress are (1) that the act allegedly causing the harm was intentional or reckless, (2) that the act was outrageous, and (3) that the act caused (4) extreme emotional distress to another.  <u>Hac v. Univ. of Hawai'i</u>, 102 Hawai'i 92, 106-07, 73 P.3d 46, 60-61 (2003) (citations omitted).  The Supreme Court of Hawai'i has held that the act complained of must be "outrageous" as the term is employed in the *Restatement (Second) of Torts* § 46 (1965):

It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.  Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

<u>Id.</u> at § 46 comment d.

Oyamot's Equal Employment Opportunity Commission (**EEOC**) Intake Questionnaire, Hawai'i Civil rights Commission (**HCRC**) Charge of Discrimination, and HCRC Notice of Charge of Discrimination all list Kawailoa as Oyamot's employer.

Additionally, Oyamot's Second Amended Complaint alleges:

> 3. Defendant KAWAILOA DEVELOPMENT, LLP, doing business as GRAND HYATT KAUAI RESORT & SPA AND POIPU BAY GOLF COURSE, is a Domestic Limited Liability Partnership and the owner of the Grand Hyatt Kauai Resort. Upon information and belief, Hyatt Corporation, as an agent for KAWAILOA DEVELOPMENT, LLP, is the employer of persons employed at the hotel facilities located at 1571 Poipu Road, Koloa, Hawaii 96756.

In their Answer to Oyamot's Second Amended Complaint, Kawailoa, Hyatt, and Burger state that Hyatt is the "employer of certain executive employees employed at the Grand Hyatt Kauai" but denied that Hyatt was Oyamot's employer.

At trial, Carla Thomas, who was Director of Human Resources at the Hotel during Oyamot's employment, testified that Kawailoa is the employer of "[a]ll employees with the exception of the general manager and the managing committee" at the Hotel. Oyamot testified regarding the Hotel's "executive committee" and did not state that she was a part of that committee. Oyamot also testified that she knew that the paychecks she received while working at the Hotel were issued under the name "Kawailoa Development Corporation" and that she knew that her employer at the Hotel was Kawailoa.

Oyamot's Opening Brief states that "Defendant Kawailoa Development, LLP and Hyatt Corp., d.b.a. Grand Hyatt Kauai" were her "employer" but provides no support for that assertion. Oyamot's Reply Brief acknowledges Kawailoa and Hyatt's Answering Brief which states that Hyatt is not Oyamot's employer, but does not refute that statement.

Based on the forgoing, Hyatt was not Oyamot's employer. Therefore, the Circuit Court did not err in granting judgment as a matter of law in favor of Hyatt on Counts I and II.

### ii.   Count III (IIED)

While arguing in opposition to Kawailoa and Hyatt's HRCP Rule 50 motion, Oyamot stated that because Hyatt is the manager of the Hotel which is owned by Kawailoa, the two defendants "are an agency."  However, Oyamot does not raise this argument in her Opening Brief, and thus it is waived.  See HRAP Rule 28(b)(7).  Consequently, absent a relationship between Hyatt and Burger, we conclude that the Circuit Court did not err in granting judgment as a matter of law in favor of Hyatt on Count III.

### 2.   Kawailoa

### i.   Count I (National Origin Discrimination)

The Circuit Court granted JMOL in favor of Kawailoa as to Count I on three alternative bases.  First, that Oyamot "failed to introduce evidence at trial to establish that she obtained a right to sue notice from the HCRC."  Second, that Oyamot "has not established that she was subjected to an 'adverse employment action.'"   Third, that Oyamot "failed to proffer specific and substantial circumstantial evidence, and a reasonable jury could not find, that [Kawailoa's] reasons for issuing Employee Discussion Forms were pretextual and that ancestry discrimination was the real reason for the issuance of the Employee Discussion Forms."[13]

---

[13]   HRS § 378-4 (2015) provides that "[t]he [HCRC] shall have jurisdiction over the subject of discriminatory practices made unlawful by" Part I of HRS Chapter 378, which includes HRS § 378-2.  See also Schefke v. Reliable Collection Agency, Ltd., 96 Hawai'i 408, 416 n.5, 32 P.3d 52, 60 n.5 (2001) (holding that Plaintiff "could not bring his compensation discrimination claim [pursuant to HRS § 378-2(1)(A) (1993)] until he received a notice of right to sue" from the HCRC).

When a claim of discrimination under HRS § 378-2(1)(A) relies on circumstantial evidence, the court engages in a three-step analysis: the plaintiff must establish a prima facie case of discrimination; if the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action; and if the defendant rebuts the prima facie case, the plaintiff has the burden to demonstrate that the defendant's reasons were pretextual.  See Nozawa v. Operating Eng'rs Local Union No. 3, 142 Hawai'i 331, 342-43, 418 P.3d 1187, 1198-99 (2018); Adams v. CDM Media USA, Inc., 135 Hawai'i 1, 13-14, 346 P.3d 70, 82-83 (2015).

With regard to the first basis, Oyamot's Second Amended Complaint alleged that she obtained a Right to Sue letter from the EEOC, and the Defendants' Answer "admit[ted] the allegations" in this regard. However, no Right to Sue letter from either the EEOC or the HCRC was attached to any of Oyamot's Complaints or admitted as evidence at trial. At trial when Kawailoa moved for judgment as a matter of law, Kawailoa acknowledged that its Right to Sue letter argument had not previously been raised, and was based instead "on the evidence entered . . . at trial."

Oyamot argues that because her receipt of a Right to Sue letter from the EEOC was admitted in the Defendants' Answer, Kawailoa waived any argument regarding the Right to Sue letter.

We conclude that, in light of the Defendants' admission in their Answer, it was improper for the Circuit Court to grant JMOL to Kawailoa on Count I because a Right to Sue letter was not admitted into evidence at trial. Cook v. Sur. Life Ins., Co., 79 Hawaiʻi 403, 412, 903 P.2d 708, 717 (1995) ("[A]n attorney should be justified in relying upon the statements of another attorney because attorneys are prohibited from '[e]ngag[ing] in conduct involving dishonesty, fraud, deceit, or misrepresentation.'") (footnote and citation omitted); see also Marvin v. Pflueger, 127 Hawaiʻi 490, 509, 280 P.3d 88, 107 (2012) (holding that expecting parties to timely raise claims serves two important functions, including discouraging "'sandbagging,' the practice of saving issues to stall proceedings at the trial level or to raise them on appeal only if they lose at trial.") (citations omitted).

In the circumstances of this case, the Circuit Court should determine if it has jurisdiction over Count I of Oyamot's Second Amended Complaint with regards to Kawailoa. On remand, the Circuit Court shall conduct further proceedings to establish whether a Right to Sue letter was indeed issued to Oyamot.

Based on the foregoing, we decline to further address the merits of the Circuit Court's rulings on Oyamot's national origin discrimination charge.

## ii. Count II (Sexual Harassment)

The Circuit Court based its JMOL ruling in favor of Kawailoa on Count II on the merits. Specifically, the Circuit Court ruled that a reasonable jury could not find that Burger's acts amounted to severe or pervasive sexual conduct, pursuant to the standard for proving hostile environment sexual harassment (**HESH**) claims under Nelson v. Univ. of Hawaii, 97 Hawai'i 378, 38 P.3d 95 (2001). Given the evidence of Burger's "continuous[]" and "ongoing" verbal and physical conduct, to which Oyamot testified at trial, we conclude that the Circuit Court erred in granting judgment as a matter of law for Kawailoa on Count II.

In Nelson, the Supreme Court of Hawai'i held that, in order to establish a HESH claim, the claimant must show that:

> (1) he or she was subjected to sexual advances, requests for sexual favors, or other verbal or physical conduct or visual forms of harassment of a sexual nature; (2) the conduct was unwelcome; (3) the conduct was severe or pervasive; (4) the conduct had the purpose or effect of either: (a) unreasonably interfering with the claimant's work performance, or (b) creating an intimidating, hostile, or offensive work environment; (5) the claimant actually perceived the conduct as having such purpose or effect; and (6) the claimant's perception was objectively reasonable to a person of the claimant's gender in the same position as the claimant.
>
> In addition, with regard to the third element of the claim, we observe that the required showing of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct. For example, a single severe act can be enough to establish a claim, and multiple incidents, each of which may not be severe when considered individually, can be enough to establish a claim when evaluated collectively.
>
> Moreover, we emphasize that, to establish the last two elements of a HESH claim, it is not necessary for the claimant to prove that he or she has suffered tangible physical or psychological harm: the claimant's perception is the harm as long as the perception is objectively reasonable. See Harris[v. Forklift Sys., Inc., 510 U.S. 17 (1993)], *supra.*
>
> Finally, we emphasize that, in evaluating a HESH claim for purposes of . . . judgment as a matter of law, . . courts must "look at the record as a whole and at the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred." Steinberg[ v. Hoshijo], 88 Hawai'i [10,] 18, 960 P.2d [1218,] 1226[, *reconsideration denied,* 88 Hawai'i 10, 960

P.2d 1218 (1998)] (citing [Hawai'i Administrative Rules] § 12-46-109(b)).

Id. at 390-91, 38 P.3d at 109-10 (footnote omitted). Furthermore, as stated *supra*, a motion for judgment as a matter of law may be granted "only when after disregarding conflicting evidence, giving to the non-moving party's evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in the non-moving party's favor," it can be concluded that there is no evidence to support a jury verdict in the non-moving party's favor. Hirayasu, 110 Hawai'i at 251, 131 P.3d at 1233 (emphasis added) (citation omitted).

Based on our review of the record and applying the judgment as a matter of law standard, we conclude that reasonable jurors could determine from the evidence and the inferences which may be fairly drawn therefrom that Burger's behavior created a hostile work environment. We will address each of the elements enumerated in Nelson below.

First, the record contains numerous instances of verbal conduct of a sexual nature and physical conduct that a jury could reasonably determine was sexual in nature.

With regard to Burger's verbal conduct, Oyamot testified that Burger repeatedly asked her when she was going to divorce her husband, and that Burger would talk to her about her husband "[v]ery often, especially when he tried to touch me, pinch me, and also especially when he tried to touch my breast." Oyamot also testified that she understood Burger's comment that Thai women are "gold digger[s]" to mean that "Thai woman is easy to get. She can sleep with anybody, anyone. And the reason why she sleep with everyone, because she need the money." Oyamot also testified that Burger would "bully" her.

With regards to Burger's physical conduct, Oyamot testified that "Burger started to touch me since he moved to [my] department from 2008 until 2010. He continuously touch me." Oyamot further testified that Burger subjected her to "ongoing"

touching over the course of his time as her supervisor at the Hotel. Oyamot testified that Burger would "pinch" her arm and "squeeze" around her arm and "tweak or pull[] around [her] arm." Oyamot also testified that Burger touched her shoulder. Oyamot testified that Burger's touching resulted in a bruise on her arm twice. Oyamot testified that Burger "tried to pull me one time to sit on his lap" but that she did not sit on his lap, and that "he tried to grab, but I step back two steps."[14] Oyamot testified that she was concerned that Burger would touch her chest. Oyamot further testified that Burger would sometimes touch her in his office when the door was closed, including when he tried to pull her to sit on his lap. Finally, Oyamot testified that "[e]very time when Mr. Burger touched me, I would tell him don't do it because it's not the right thing to do." Oyamot also testified to the following:

> [MASUI]: Was there anything sexual about the way he was touching and pinching you?
>
> [OYAMOT]: He did touch around my arm. When he touch, he always pull and tweak it very hard.

As stated *supra*, this court must look at the record as a whole and at the totality of the circumstances, including the context in which the alleged incidents occurred. Nelson, 97 Hawai'i at 391, 38 P.3d at 110. We conclude that a jury could reasonably determine that, from a reasonable woman's perspective, the evidence of Burger touching Oyamot, when contextualized with Burger's comments, could rise to the level of conduct that is sexual in nature. Id. at 391, 397, 38 P.3d at 110, 116 (see also Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (holding that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances[,]" such that certain behavior would reasonably be experienced as abusive

---

[14] It is unclear how many times Burger allegedly pulled Oyamot's arm to have her sit in his lap. Oyamot testified on the same day at trial that it happened "three times" and also that it "happened once[.]"

by certain persons, but not others) (citation omitted); <u>Ellison v. Brady</u>, 924 F.2d 872, 879 (9th Cir. 1991) (adopting the perspective of a reasonable woman in evaluating HESH claims) (citations omitted)).

Second, Oyamot testified at trial that "[e]very time when Mr. Burger touched me, I would tell him don't do it because it's not right thing to do" and that "I told him every time, 'Don't touch me,' but especially at the workplace[.]" Oyamot testified that when Burger commented about her relationship with her husband, she "did not like it." Oyamot also testified that when Burger said all Thai women are gold diggers, she understood the comment to mean that "Thai woman is easy to get. She can sleep with anybody, anyone. And the reason why she sleep with everyone, because she need the money." Oyamot testified that the gold digger comment made her feel "worthless[,]" and that Burger "look[ed] down at Thai people." A jury could reasonably determine that Burger's conduct was unwelcome.

Third, Oyamot repeatedly testified that Burger's conduct was "continuous" and "ongoing[.]"

Fourth, Oyamot testified that Burger's conduct made her feel "shame in front of other coworkers[,]" worthless, looked down upon, and that her workplace was "not safe anymore" and that she was "afraid." Oyamot further testified that she stopped working at the Hotel on December 11, 2010 because she was "really stressed" and "couldn't eat and couldn't sleep." Oyamot testified that she attempted to go back to work on December 24, 2010, but could not because she was "really stressed out[.]" Oyamot testified that she sought medical help to address her work-related stress.

Fifth, Oyamot testified that she spoke to Leimomi Lum (**Lum**), the Human Resources Manager at Kawailoa about Burger's conduct and its effect on her:

> [OYAMOT]: [. . . .] I spoke to Ms. Leimomi Lum about five to six things. First thing I told her about Mr. Burger ask me when I'm going to divorce with my husband. And I told her about when he touch me and squeeze me in front of

22

> my friends and he been doing -- ongoing for two years in his office.
>
> . . . .
>
> And I also told Leimomi that I am afraid. I feel that workplace is not safe anymore. I told Leimomi Lum about this matter and she ask me why I been kept quiet so long, and I told her because I'm afraid to get fire.

Oyamot also testified that she could not continue working after she returned for one day on January 5, 2011, "because even though Jonathan Burger was transferred to a different department, I was still afraid that he would come back to bully me again. I was very afraid. I couldn't concentrate. I was very afraid. I was shaking. I was scared."

Sixth, jurors could reasonably determine from Oyamot's testimony recited above that her perception was objectively reasonable to a woman in her position.

Based on the foregoing, a jury could reasonably determine that the elements of a HESH claim were met. The evidence and the inferences which may be fairly drawn therefrom, when considered in a light most favorable to Oyamot, the non-moving party, show that jurors could reasonably conclude that Burger's behavior created a hostile work environment.

Therefore, we conclude that the Circuit Court erred in granting Kawailoa's HRCP Rule 50 motion with regards to Count II.

### iii. Count III (IIED)

The Circuit Court based its JMOL ruling in favor of Kawailoa on Count III on, *inter alia,* operation of Hawaii's Workers' Compensation Law, HRS § 386-5 (2015), which precludes IIED claims not based on sexual harassment or sexual assault. Based on our conclusion that the Circuit Court erred in granting Kawailoa's Rule 50 Motion on Count II, we similarly vacate the Circuit Court's Kawailoa and Hyatt JMOL Order with regards to Kawailoa on Count III.

### 3.    Burger

The Burger JMOL Order, which dealt with Count III
(IIED),[15] was granted on two alternative bases: (1) that Oyamot
failed to prove by clear and convincing evidence pursuant to HRS
§ 386-8 (2015)[16] that Burger's acts constituted "wilful and
wanton misconduct" and (2) that Oyamot failed to show that
Burger's conduct was outrageous.  We disagree.

### i.    Outrageousness

In Ross v. Stouffer Hotel Co. (Hawaiʻi) Ltd., Inc., the
Supreme Court of Hawaiʻi held that the act complained of in an
IIED claim must be "outrageous," as the term is employed in the
Restatement (Second) of Torts § 46.  76 Hawaiʻi 454, 465, 879
P.2d 1037, 1048 (1994) (citation and footnote omitted).

As stated supra in explaining the type of "outrageous"
conduct that makes a claim for intentional infliction of
emotional distress actionable, the Restatement (Second) of Torts
states:

> It has not been enough that the defendant has acted with an
> intent which is tortious or even criminal, or that he has
> intended to inflict emotional distress, or even that his
> conduct has been characterized by "malice," or a degree of
> aggravation which would entitle the plaintiff to punitive
> damages for another tort.  Liability has been found only
> where the conduct has been so outrageous in character, and
> so extreme in degree, as to go beyond all possible bounds of
> decency, and to be regarded as atrocious, and utterly
> intolerable in a civilized community.  Generally, the case
> is one in which the recitation of the facts to an average
> member of the community would arouse his resentment against
> the actor, and lead him to exclaim, "Outrageous!"

Id. at § 46 comment d.  Furthermore, "[t]he question whether the
actions of the alleged tortfeasor are unreasonable or outrageous
is for the court in the first instance, although where reasonable

---

[15]  Counts I and II against Burger were adjudicated by way of summary
judgment in his favor, and Oyamot does not challenge those rulings on appeal.

[16]  At the time the alleged offenses occurred in the instant case, HRS §
386-8 provided, in relevant part:

> §386-8  Liability of third person. . . .
> Another employee of the same employer shall not be relieved
> of his liability as a third party, if the personal injury is
> caused by his wilful and wanton misconduct.

persons may differ on that question it should be left to the jury." Wong v. Panis, 7 Haw. App. 414, 421, 772 P.2d 695, 700 (1989) (citing Restatement (Second) of Torts § 46 cmt. h), overruled on other grounds by Young v. Allstate Ins. Co., 119 Hawai'i 403, 198 P.3d 666 (2008).

Based on the evidence discussed supra, we conclude that reasonable jurors might differ on whether Burger's conduct toward Oyamot rose to the level of outrageousness, and therefore the issue should have been left for the jury to decide.

### ii. Willful and Wanton Misconduct

In Iddings v. Mee-Lee, the Supreme Court of Hawai'i held that the term "wilful and wanton misconduct," as used in HRS § 386-8, includes conduct that is either: (1) motivated by an actual intent to cause injury; or (2) committed in circumstances indicating that the injuring employee (a) has knowledge of the peril to be apprehended, (b) has knowledge that the injury is a probable, as opposed to a possible, result of the danger, and (c) consciously fails to avoid the peril. 82 Hawai'i 1, 12, 919 P.2d 263, 274 (1996). Claims based on wilful and wanton misconduct must be proven by clear and convincing evidence. Id. at 12-14, 919 P.2d at 274-76.

The Burger JMOL Order states that "there is no evidence in the record that Defendant Burger had an intent to cause injury" but does not address the second alternative basis for finding wilful and wanton misconduct.

The evidence discussed supra shows that Burger knew he was touching Oyamot and making sexual comments to her, that such conduct was unwelcome, and that he continued his behavior anyway. Viewing the evidence in a light most favorable to Oyamot, we conclude that jurors could reasonably determine that Oyamot met her burden of proof that Burger acted in a wilful and wanton manner.

Based on the foregoing, the Circuit Court erred in granting the Burger JMOL Order, which addressed Count III.

25

### C. Other Points of Error

The remainder of Oyamot's Points of Error on appeal address whether the circuit court erred by barring expert and lay witnesses, its ruling on Motions in Limine by all parties, and its rulings on Dr. Skow's Motion to Quash. Based on our rulings on the Rule 50 Orders, which will require a new trial, we need only address the orders regarding Dr. Skow's Motion to Quash.

Oyamot's Opening Brief does not argue that the Circuit Court erred by quashing the subpoena, and instead focuses on the sanctions awarded by the Court's Order. Specifically, Oyamot contends that "the court's sanction against both [Masui] and [Oyamot] showed its extreme hostility since there was no statutory basis to impose sanctions for a validly issued and served subpoena[.]"

In her Answering Brief, Dr. Skow argues, *inter alia*,[17] that the "arguments of Counsel and exhibits attached to Dr. Skow's Motion to Quash clearly supported an award of attorneys' fees and costs and a finding of bad faith on the part of [Oyamot's] counsel which caused disruption to the trial of the above-entitled matter and to Dr. Skow's medical practice."

In Kukui Nuts of Hawaii, Inc. v. R. Baird & Co., Inc., 6 Haw. App. 431, 726 P.2d 268 (1986), this court noted that:

> [a]lthough the trial court possesses inherent power to do those things necessary for the proper administration of justice, Barks v. White, 365 N.W.2d 640 (Iowa App. 1985); Roadway Express, Inc. v. Piper, 447 U.S. 752, 100A S.Ct. 2455, 65 L.Ed.2d 488 (1980); Jacuzzi v. Jacuzzi Bros., Inc., 243 Cal.App.2d 1, 52 Cal.Rptr. 147 (1966), including the

---

[17] Dr. Skow's Answering Brief also argues that the Circuit Court properly issued sanctions pursuant to (1) HRCP Rules 26(c), 37(a)(4) and 45; and (2) its "inherent power to curb abuses and promote a fair process," which included "the discretion to issue sanctions to control litigation based upon the facts of the case."

Regarding the first assertion, HRCP Rules 26 and 37 pertain to discovery. The Circuit Court did not indicate it was relying on these rules in issuing the sanction. HRCP Rule 45 pertains to subpoenas, but has no provision for monetary sanctions or attorneys' fees and costs. Again, the Circuit Court did not rely upon these rules in issuing the sanction.

In support of her second argument, Dr. Skow cites Stender v. Vincent, 92 Hawai'i 355, 992 P.2d 50 (2000). However, the holding in Stender pertained to discovery sanctions prompted by spoliation of evidence and is thus inapplicable to the instant case. Id. at 361-65, 992 P.2d at 56-60.

26

> power to issue contempt sanctions, <u>Cooke v. United States</u>, 267 U.S. 517, 539, 45 S.Ct. 390, 395, 69 L.Ed. 767, 775 (1925), impose sanctions for discovery abuses, <u>Barks v. White</u>, *supra*, and assess attorney's fees for abusive litigation practices, <u>Roadway Express, Inc. v. Piper</u>, *supra*, "[b]ecause inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." <u>Roadway Express, Inc. v. Piper</u>, 447 U.S. at 764, 100A S.Ct. at 2463, 65 L.Ed.2d at 500.
>
> In <u>Roadway Express, Inc.</u>, *supra*, the supreme court stated that a finding that counsel's conduct "constituted or was tantamount to bad faith" was a necessary precedent to any sanction of attorney's fees under the court's inherent powers. <u>Id.</u> 447 U.S. at 767, 100A S.Ct. at 2465, 65 L.Ed. at 502. We adopt the bad faith requirement set forth in Roadway as a limitation on the trial courts' inherent powers to impose sanctions of attorney's fees for abusive litigation practices, and we will review the lower court's action for abuse of discretion in light of that limitation.

<u>Id.</u> at 436-37, 726 P.2d at 271-72. However, the Supreme Court of Hawai'i has clarified that a circuit court's sanction order based on a finding of bad faith may be affirmed even if the explicit words "bad faith" are not recited therein. <u>Bank of Hawaii v. Kunimoto</u>, 91 Hawai'i 372, 390, 984 P.2d 1198, 1216 (1999). To support its holding, the Supreme Court noted that:

> [t]he circuit court expressly found: (1) that appellants "knew or should have known" that the [Central Pacific Bank, Inc.] stock was in issue; (2) that appellants' conduct in receiving the stock constituted a fraud upon the court; and (3) that appellants' conduct was, at best, reckless and, at worst, knowing and intentional. These findings are tantamount to a specific finding of bad faith. In other words, these findings are sufficient to enable this court to infer a specific finding of bad faith by the circuit court.

<u>Id.</u>

In the instant case, the Circuit Court's written Order Granting Dr. Skow's Motion to Quash did not contain any findings of bad faith conduct by Oyamot or her counsel, or any other specific findings. A review of transcripts from September 10 and 11, 2015, regarding the issues pertaining to Dr. Skow, also do not contain explicit findings. However, in addressing various issues related to Dr. Skow -- including whether Oyamot's counsel had received a faxed report from Dr. Skow that had not been timely disclosed to the defendants -- the Circuit Court expressed its "serious concerns" regarding representations by Oyamot's

27

counsel and "serious concerns about the issues raised by defense counsel as to what appears to be discovery violations" by Oyamot related to Dr. Skow. The Circuit Court subsequently issued the Order Granting Dr. Skow's Motion to Quash on October 5, 2015, which included the sanction awarding $4,045.47 in fees and costs to Dr. Skow against Oyamot.

Given the record, there are no explicit findings by the Circuit Court, but the Circuit Court clearly expressed its serious concerns about the conduct of Oyamot's counsel on the record in several respects. In these circumstances, we deem it best to remand to the Circuit Court for further proceedings on the sanction, so that the Circuit Court can make relevant findings -- one way or the other -- as to whether Oyamot acted in bad faith.

Based on the foregoing, Oyamot waived any challenge to the quashing of the subpoena of Dr. Skow. Further, we remand for further proceedings on the sanction awarded to Dr. Skow.

## IV. Conclusion

Based on the foregoing, the Circuit Court's "Order Granting Movant Stephanie Skow, M.D.'s Motion to Quash Subpoena, or in the Alternative, Motion for Protective Order and for Award of Fees and Costs" entered on October 5, 2015 and the "Order Denying Plaintiff Phannathon Oyamot's Amended Motion to Reconsider Stephenie [sic] Skow's Motion to Quash Subpoena, or in the Alternative, Motion for Protective Order Filed Sept. 1, 2015 Or to Stay Sanctions Pending Appeal" entered on January 22, 2016 are vacated in part with regard to the award of $4,045.47 in attorney's fees and costs.

The Circuit Court's "Final Judgment" entered on November 23, 2015 is vacated with regards to Kawailoa on Counts I, II and III, and Burger on Count III. In all other respects, the Final Judgment is affirmed.

28

The case is remanded to the Circuit Court of the Fifth Circuit for further proceedings consistent with this Memorandum Opinion.

DATED:  Honolulu, Hawai'i, November 27, 2019.

Chief Judge

On the briefs:

Stanford H. Masui,
Erin B.J.H. Masui,
for Phannathon Oyamot.

Associate Judge

Barbara A. Petrus,
for Jonathan Burger.

Associate Judge

Stanley M. Chow,
for Stephanie Skow, M.D.